# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JONATHAN THOMAS JORGL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0669-LWW |
| | ) | |
| AIM IMMUNOTECH INC., | ) | |
| THOMAS K. EQUELS, WILLIAM | ) | |
| MITCHELL, and STEWART | ) | |
| APPELROUTH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 6, 2022
Date Decided: October 28, 2022

Jeffrey J. Lyons, BAKER & HOSTETLER LLP, Wilmington, Delaware; Teresa Goody Guillén, BAKER & HOSTETLER LLP, Washington, D.C.; Marco Molina, BAKER & HOSTETLER LLP, Costa Mesa, California; *Counsel for Plaintiff Jonathan Thomas Jorgl*

Michael A. Pittenger, William R. Denny, Matthew F. Davis, Nicholas D. Mozal, Laura G. Readinger, Carson R. Bartlett, & Shelby M. Thornton, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants AIM ImmunoTech Inc., Thomas K. Equels, William Mitchell, and Stewart Appelrouth*

**WILL, Vice Chancellor**

The plaintiff in this matter, Jonathan Thomas Jorgl, has been a stockholder of AIM ImmunoTech, Inc. since June 27, 2022. Jorgl first learned of AIM just days before buying stock when his surfing buddy Michael Rice, who desired a seat on AIM's board, asked Jorgl to buy shares for the purpose of nominating him. Jorgl bought about $800 worth of AIM stock and transferred the shares into his name of record with the guidance of Rice, Rice's former colleague Robert Chioini who also wished to be a board candidate, and Chioini's business associate Michael Xirinachs. None of Rice, Chioini, or Xirinachs were AIM stockholders.

On July 8, Jorgl (working with Rice, Chioini, and counsel) submitted a notice to AIM that proposed the nominations of Rice and Chioini to AIM's board of directors. The board suspected that Jorgl's nomination was not submitted out of the blue given that another stockholder, Walter Lautz, had tried to nominate Chioini in April.

The board deduced that Lautz had been working on behalf of stockholder Franz Tudor, who had been vexing AIM since 2020 with threatening emails and interference with AIM's business contacts. Tudor's actions had led AIM to seek injunctive relief against him in Florida and to send cease-and-desist letters requesting that Tudor comply with federal securities laws. The quick succession and commonalities between the failed Lautz nomination and the Jorgl nomination prompted the board to investigate.

After reviewing information showing that Rice and Chioini also had ties to Tudor, the board came to believe that Jorgl's notice omitted to mention arrangements or understandings with an undisclosed group. Such disclosure was required by AIM's advance notice bylaw. The board voted to reject Jorgl's notice and to commence litigation against Jorgl, Chioini, Rice, Tudor, and others for potential violations of federal securities laws.

Jorgl responded by filing litigation in this court, seeking a preliminary mandatory injunction requiring the board to accept his nomination and include his nominees on a universal proxy card. Despite Jorgl's insistence that no discovery was necessary to prove his claim, expedited discovery ensued. That discovery indicated that a web of individuals had worked together to bring Jorgl's nomination forward.

The facts read like a game of telephone. Tudor, desiring to take control of the board, asked Lautz to nominate Chioini (and another individual). When Lautz failed, Tudor, Chioini, and Xirinachs regrouped to find another stockholder to be the public face of their effort. Chioini asked Rice to run alongside him, and Rice asked Jorgl to become a stockholder. Jorgl then bought shares and transferred them into record name with the help of Xirinachs. Rice promised Jorgl he would not be on the hook for any expenses, and Jorgl submitted his nomination notice to AIM. Xirinachs

2

and Chioini then formally engaged counsel and Xirinachs officially agreed to provide funding.

Other than describing a potential agreement for Chioini and Rice to reimburse certain costs, Jorgl did not mention any arrangements or understandings with Tudor or Xirinachs in his nomination notice. Jorgl argues that his notice was compliant because he knew nothing about the involvement of Tudor or Xirinachs at the time he submitted it. Maybe so. But the evidence put forward by the defendants indicates that Jorgl's notice was—at best—misleading.

Jorgl also asserts that the board's rejection of his notice was inequitable, requiring this court to step in. He argues that the board sought to entrench itself at the expense of his rights as a stockholder. The limited record before me, however, suggests that the directors concluded a clandestine plan was afoot. I cannot say that they were wrong or that they acted unreasonably.

At bottom, there are myriad factual disputes that make the imposition of mandatory relief impossible. Without the benefit of a trial, I cannot resolve these questions of fact. And—in light of the evidence presented by the defendants—I certainly cannot find that Jorgl is entitled to a judgment as a matter of law.

Jorgl's motion for a preliminary mandatory injunction is therefore denied.

## I.    FACTUAL BACKGROUND

This background is drawn from the undisputed facts in the plaintiff's Verified Complaint and the record developed in connection with the plaintiff's motion for a preliminary injunction.[1]  The record includes over 100 exhibits and the deposition testimony of 12 witnesses.[2]  Based on the current record, the following facts are those that I conclude are likely to be found after trial.[3]

### A.    AIM and Its Board

AIM ImmunoTech, Inc. ("AIM" or the "Company") is an immuno-pharma company focused on the research and development of therapeutics to treat cancers, immune disorders, and viral diseases.[4]  Its common stock is publicly traded on the NYSE American exchange.[5]  AIM has three directors: defendants Thomas Equels, Dr. William Mitchell, and Stewart Appelrouth.[6]

---

[1] *See* Dkt. 1 ("Compl.").

[2] Citations in the form "PX__" refer to exhibits to the Transmittal Affidavit of Jeffrey J. Lyons to Plaintiff's Motion for Preliminary Injunction.  Dkt. 114.  Citations in the form "DX__" refer to exhibits to the Transmittal Affidavit of Shelby M. Thornton in Support of Defendants' Answering Brief in Opposition to Plaintiff's Motion for Preliminary Injunction.  Dkt. 130.  Deposition transcripts are cited as "[Name] Dep."

[3] *See In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 578 (Del. Ch. 2010).

[4] Compl. ¶ 15.

[5] *Id.*

[6] *Id.*  ¶¶ 12-14, 18.

In 2015, AIM's board of directors (the "Board") was composed of its then-Chief Executive Officer Dr. William Carter, Peter Rodino, Iraj Kiani, Equels, and Mitchell. In February 2016, the Board removed Carter from his position as CEO, and Carter resigned from the Board.[7] The remaining directors resolved to appoint Equels (a lawyer by training) as CEO and Mitchell (an academic with experience overseeing clinical trials) as Chairman.[8]

In June 2016, Kiani resigned from the Board, leaving Equels, Mitchell, and Rodino as its sole members.[9] Rodino then resigned from the Board to become AIM's General Counsel.[10] Appelrouth, who had previously performed accounting and investigatory services for AIM, was nominated and elected as the third Board member at the 2016 annual stockholder meeting.[11]

The Board has been composed of Equels, Mitchell, and Appelrouth ever since. They have been reelected in unopposed elections each year through the present.[12] At AIM's 2021 annual meeting, the incumbent directors received slight majorities

---

[7] DX 4; DX 100 ("Equels Dep.") 46-51; DX 98 ("Mitchell Dep.") 23-24; DX 96 ("Rodino Dep.") 106.

[8] PX 4; PX 5.

[9] PX 6.

[10] Rodino Dep. 10, 62-65. Rodino took on other executive roles as well. *Id.*

[11] PX 7; PX 8; Equels Dep. 79-80; DX 5 at 73.

[12] Compl. ¶ 19.

"for" their unopposed reelection bids, with each director receiving about 79% support excluding abstains.[13]

## B. Tudor's Outreach

Franz Tudor is an AIM stockholder who made himself known to AIM and its directors in 2020. At first, Tudor sought to become AIM's business development consultant.[14] AIM's executives felt it would be problematic for Tudor to serve in that role after learning that Tudor had been "convicted of insider trading."[15] In 2009, Tudor pleaded guilty to securities fraud and conspiracy to commit securities fraud. He was enjoined from, among other things, engaging in certain activities related to "penny stocks."[16]

After AIM declined to offer Tudor a consulting role, a "barrage of activity" followed.[17] For example, Tudor reached out to AIM's business contacts and to a

---

[13] *See* PX 22 Ex. A at 7.

[14] Equels Dep. 124.

[15] *Id.* at 124-25; *see also id*. at 103-04, 117-18; Rodino Dep. 180-82; DX 18. Equels, who was deposed in this action, submitted an affidavit detailing his interactions with Tudor. *See* DX 85. I attribute little weight to his "non-adversarial proffer[]." *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000) (describing witness affidavits and explaining that the court will "ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers"). I take the same approach to the affidavit of Robert Chioini submitted by the plaintiff. PX 22. I focus, instead, on the contemporaneous documents and deposition testimony.

[16] *See* DX 85 Ex. A; DX 18.

[17] Equels Dep. 125.

lobbyist who then purportedly contacted the FDA.[18] These interactions prompted AIM to send a cease-and-desist letter to Tudor.[19]

In February 2021, AIM commenced litigation against Tudor in Florida state court, seeking injunctive relief. On August 13, 2021, the Florida court entered a stipulated injunction indefinitely enjoining Tudor from contacting AIM's business relations.[20] Tudor subsequently contacted AIM's financial advisor and its investor relations firm.[21] At times, Tudor has made varying representations about his own stockholder status and claimed that he represents stockholders holding more than one million shares of AIM stock.[22]

AIM stockholder Todd Deutsch—who had worked with Tudor at Galleon Group[23]—also engaged in outreach to AIM and its investor relations consultant to express his concerns with and criticisms of the company. In a May 2022 email,

---

[18] DX 14; DX 15; DX 17; *see also* DX 19.

[19] *See* DX 16; Equels Dep. 104; Rodino Dep. 181-83; *see also* Mitchell Dep. 58-59.

[20] *See* PX 34; PX 35.

[21] *See* Rodino Dep. 183; DX 55.

[22] *See* DX 10 (Tudor writing, "I now represent over 1 mil shares btwn the various funds i consult and my own ownership. Why do you think stock didn't break 2.65 today? That was us buying every share sub 2.70."); DX 12 (Tudor stating, "I am an AIM shareholder and represent some of AIMs largest shareholders"); DX 13 (Tudor describing himself as "a shareholder of record and speaking for multiple large shareholders of record" he was "in direct contact with"); *but see* Tudor Dep. 64 (saying that he made these representations to get AIM's attention).

[23] Equels Dep. 107, 182 (testifying that Tudor and Deutsch were "part of" and "testified" in connection with an insider trading probe concerning Galleon Group).

Deutsch represented to AIM that he owned about 2 million shares of AIM stock.[24]

In June, he wrote that he owned 4.9% of AIM and "5 plus times the amount of stock" owned by Equels.[25] Deutsch was communicating with Tudor, and Ted Kellner—another AIM stockholder—about AIM during this time.[26]

## C.    The Lautz Nomination

In late 2021, Walter Lautz, who also claimed to be a "significant shareholder of AIM," emailed Equels and AIM's investor relations firm, critiquing the company's performance and telling Equels to "[s]tep up or get out."[27] Lautz had been introduced to Tudor in late 2020. By December 2021, they were communicating about AIM's performance and the need to have an "activist . . . come in" and to "oust[]" the Board.[28]

---

[24] DX 54.

[25] DX 57.

[26] *See* DX 59 (Deutsch emailing Tudor and Kellner, inadvertently copying AIM and its investor relations firm, asking Tudor to participate in a call).

[27] DX 24.

[28] *See* DX 23 ("Aim needs an activist to come in now."); *see also* DX 21 ("We need to find a way to get [T]om [Equels] ousted."); DX 22 ("[T]his board needs to be ousted."); Tudor Dep. 35-36, 44-46. The plaintiff objects to the defendants' introduction of DX 21, DX 22, and DX 23 (among others) on hearsay grounds. *See* Pl.'s Reply Br. 5. But these documents are not being offered to prove the truth of the matter asserted. They are offered to prove that Tudor made statements to Lautz. *See Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1, 21 (Del. 2005) ("A statement is not hearsay if offered only to prove that the statement was made, rather than for the truth of any matter asserted." (citing D.R.E. 801(c))); *Hunt v. State*, 1987 WL 36369, at *2 (Del. Feb. 11, 1987) (TABLE) (explaining that testimony was not hearsay when it was "not being offered to prove the truth of any matter asserted, but rather to prove that the statement was made" (citing D.R.E.

In April 2022, Lautz and Tudor discussed the possibility of Lautz nominating two candidates for the AIM Board. Tudor set out to find potential nominees.[29] Tudor contacted Robert Chioini, who he had known since 2011 or 2012 when Tudor had worked as "a business development consultant for [Chioini]" with Rockwell Medical Technologies, Inc.[30] Chioini was a founder of Rockwell Medical and served as its CEO until he was terminated in 2018.[31] Tudor also reached out to his friend Daniel Ring about serving as a Board candidate.[32] Tudor relayed to Deutsch that Ring could "be on the AIM B[oard]" and wrote "[w]e will need a shareholder to make the nomination and [I] will get everything together."[33]

On April 18, Tudor introduced Ring and Chioini to Lautz.[34] Tudor also sent Chioini an email with the subject line: "Rob Chioini – AIM BOD Nomination Acceptance Letter."[35] Later that day, Lautz submitted a letter to AIM purporting to

---

801(c))). This is likewise the case for other exhibits that are the subject of the plaintiff's hearsay objection: DX 30, DX 31, DX 32, DX 33, DX 50, DX 55, DX 56, DX 58, DX 60, DX62, DX 63, DX 65, DX 67, DX 71, DX 79, and DX 80.

[29] *See* Tudor Dep. 46-47.

[30] *Id.* at 38-39. Tudor had ongoing business ties to Chioini until March 2021. *Id.*

[31] *Id.*

[32] *Id.* at 48; DX 101 ("Ring Dep.") 7-10.

[33] DX 30.

[34] DX 31; DX 33; *see* DX 97 ("Chioini Dep.") 28-29; Ring Dep. 8; DX 103 ("Lautz Dep.") 47-48.

[35] DX 32.

nominate Ring as a candidate for the Chairman of the Board and Chioini as a director candidate.[36]

On April 25, Chioini sent the 2021 AIM proxy statement to his business associate, Michael Xirinachs.[37] Xirinachs was, like Chioini, a founder of Rockwell Medical.[38] Chioini and Xirinachs had partnered on various endeavors regarding medical device and drug companies.[39] Chioini hoped that Xirinachs would work with him on the AIM "opportunit[y]."[40] Xirinachs was facing legal trouble at the time of Chioini's outreach (and recently pleaded guilty to two counts of federal wire fraud).[41] Xirinachs and Chioini continued to engage over the ensuing weeks.

### D. The Renewed Nomination Effort

On April 28, AIM rejected Lautz's proposal to nominate Chioini and Ring as Board candidates. AIM's letter to Lautz explained that the proposal failed to comply with the Securities Exchange Act.[42] AIM then obtained confirmation of its rejection

---

[36] DX 37; Lautz Dep. 29-30 (testifying that Tudor drafted the nomination letter and that Lautz reviewed but made no changes to it).

[37] DX 43; *see* Chioini Dep. 71-74.

[38] DX 1 at 7-8.

[39] Chioini Dep. 73-74.

[40] *Id.* at 74.

[41] DX 91 at 19.

[42] *See* DX 48.

10

from the SEC.[43] Equels and others suspected that Tudor was involved with the Lautz nomination.[44]

After the failed Lautz proposal, Chioini continued to seek a path onto the Board.[45] On April 29, Chioini sent AIM's bylaws to Xirinachs, pointing out the advance notice provision and timing considerations to submit a director nomination.[46] The next day, Chioini emailed Xirinachs about setting up a call with Tudor regarding the "AIM deal."[47] On May 3, Tudor and Xirinachs were invited to a call with Chioini and counsel from Baker & Hostetler LLP with the subject "Potential Engagement: Proxy Contest."[48]

On May 17, Tudor sent an email to AIM's outside investor relations firm, copying Equels. Tudor expressed frustration at being rebuffed, writing: "By totally ignoring me and not acting professionally you now get gloves off. . . . This is just

---

[43] DX 85 Ex. C.

[44] *See* Equels Dep. 174-75, 215-17; Mitchell Dep. 54; Appelrouth Dep. 99.

[45] *See* Chioini Dep. 30-33.

[46] DX 49 ("The window to submit a director nomination is 90-120 days prior to the anniversary of last year's annual meeting. . . . The bylaws with some relevant provisions highlighted are attached.").

[47] DX 50 ("I also want to have a call with [Tudor] today re AIM deal, preferably before 6PM because I am supposed to speak with the lawyer afterward tonight, so let [m]e know what time you can do the call.").

[48] DX 52; *see also* DX 51.

[d]isgusting."[49]  Equels assumed that Tudor's email was prompted by the rejection of the Lautz proposal.[50]

AIM's outside counsel subsequently sent letters to Deutsch, Kellner, and Tudor's counsel highlighting "a series of actions about which [AIM] ha[d] serious concerns."[51]  The letters asked Deutsch, Kellner, and Tudor to comply with the requirements of Section 13(d) of the Exchange Act.[52]  AIM anticipated that Tudor and others would commence a proxy contest.[53]

On June 2, Tudor emailed Deutsch to report that he had "2 strong candidates to run and get control of the BOD" and "a shareholder who [wa]s will[ing] to have their name as the lead" but had been unsuccessful in finding "anyone to front the $150K" of associated costs.[54]  Tudor and Chioini asked Lautz if he would launch a second nomination effort.[55]

Lautz initially considered it, though he questioned whether his involvement would be a "good look" since he had been the subject of a FINRA investigation.[56]

---

[49] DX 55.

[50] *See* Equels Dep. 180-82.

[51] DX 61.

[52] *Id.*; DX 66; *see also* DX 92 at 19.

[53] Equels Dep. 179-80.

[54] DX 56.

[55] DX 58; Tudor Dep. 45, 47-50.

[56] DX 60.

Tudor forwarded Lautz's email to Chioini, who added Xirinachs to the chain. Chioini responded that he would "have the attorney look at it."[57]

Lautz subsequently declined to submit another nomination, writing that he "c[ould] not be the face of this partaking" given the risks to his reputation.[58] A few days later, Lautz asked if Tudor had been "able to find someone to be the face of the activist[.]"[59] Tudor responded: "We are still looking."[60]

In mid-to-late June, Chioini contacted Michael Rice, whose investor relations firm had served Rockwell Medical while Chioini was CEO, to ask if Rice would consider being a Board nominee.[61] Rice agreed.[62] Chioini sent Rice's contact information to Tudor, and Tudor sent Rice a write-up about AIM.[63] The three subsequently had a call about AIM.[64]

### E.    The Jorgl Nomination

In late June, Rice asked plaintiff Jonathan Jorgl, with whom he had a longstanding personal relationship, to purchase AIM stock in order to submit the

---

[57] *Id.*

[58] DX 62.

[59] *Id.*

[60] *Id.*

[61] *See* Chioini Dep. 33; DX 94 ("Rice Dep.") 34-35.

[62] *See* Rice Dep. 46-47.

[63] DX 63; DX 64.

[64] Rice Dep. 37.

nomination.[65] Jorgl agreed.[66] On June 23, Chioini texted Xirinachs and Rice saying: "Let's talk in the morning regarding 1000 share purchase and what needs to be done. The most critical part will be to get the shares once they're purchased sent to the shareholder[']s physical address immediately by DTC or the transfer agent."[67]

The next day, Chioini emailed Rice instructions that detailed how Jorgl would buy 1,000 AIM shares and move them into Jorgl's name of record.[68] Rice then texted the instructions to Jorgl.[69] Meanwhile, Tudor forwarded Chioini an email from Tudor's counsel concerning AIM's assertion that Tudor breached the Florida injunction.[70]

On June 27, after texting with Rice, Jorgl bought 1,000 shares of AIM stock.[71] Separately, Chioini and Xirinachs exchanged emails about AIM titled "AIMNominationLetter" and "SummaryofRequiredInfoandDefinitions."[72]

---

[65] *See* Compl. ¶ 43; Rice Dep. 78-80 (explaining that Rice met Jorgl "on the beach surfing").

[66] *See* Compl. ¶ 43; Rice Dep. 80-82.

[67] DX 65.

[68] DX 67.

[69] DX 70.

[70] DX 68.

[71] DX 71; DX 95 ("Jorgl Dep.") 178-79.

[72] *See* DX 93 at 4-5. The contents of those emails were withheld from production on the basis of a common interest privilege. *Id.* The plaintiff objects to the defendants' citations to Chioini's privilege log and argues that the log constitutes inadmissible hearsay. *See* Pl.'s Reply Br. 23 n.3. This court regularly considers privilege logs, where appropriate, in making fact findings. *See e.g.*, *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 512 n.91

Efforts then began to move Jorgl's shares into record name. On July 5, Chioini copied Xirinachs on an email with Baker Hostetler titled "1000 share trade."[73] Xirinachs was assisting with the transfer of Jorgl's shares from street name into record name because "every minute counted" and Xirinachs "had experience . . . and offered to help."[74] Xirinachs called Jorgl to provide guidance on how to complete the transfer over the July 4th holiday weekend.[75]

Having successfully transferred the 1,000 shares into his name, Jorgl hesitated when it came time to sign an engagement letter with Baker Hostetler. He texted Chioini: "Sorry not trying to be difficult just not comfortable taking on that obligation."[76] He asked Chioini and Rice to include language in the letter making "it clear [Jorgl] was not responsible for the retainer or the fees" but that the fees

(Del. Ch. 2010) (looking to privilege log entries to assess the timing of communications); *Bandera Master Fund LP v. Boardwalk Pipeline P'rs*, 2021 WL 5267734, at *46 (Del. Ch. Nov. 12, 2021) (discussing that a privilege log revealed heavy involvement of certain individuals). Jorgl cites no authority demonstrating that doing so is improper. As for his hearsay objection, it is once again overruled. The defendants offer the log to demonstrate that a communication occurred and the basis on which it was withheld. It is difficult to understand how they could offer the log for the communication's truth or substance when that communication was withheld entirely. *See supra* note 28.

[73] DX 73.

[74] Chioini Dep. 106-07.

[75] Jorgl Dep. 66-68; DX 72 (Chioini to Jorgl: "His name is Michael and he should be calling you now.").

[76] DX 76. Jorgl objects to the introduction of this communication on hearsay grounds. But the statement is admissible under Delaware Rule of Evidence 801(d)(2)(A). The same is true regarding DX 75 and DX 77, which are also subjects of the plaintiff's hearsay objection.

"would be paid by a third party."[77]  Chioini assured Jorgl multiple times in writing that Jorgl "would not be on the hook," emphasizing "[w]e" (i.e., not Jorgl) "are paying [the] fees."[78]

On July 8, Jorgl's notice of intent (the "Notice") to nominate Chioini and Rice as candidates for election at AIM's 2022 annual meeting was delivered to AIM.[79]  It was drafted by Baker Hostetler with input by Chioini, Rice, and Jorgl.[80]  The Notice represented that Jorgl owned 1,000 shares of AIM common stock, that he purchased the shares on June 27 for $0.87 per share, and that he had not purchased or sold any other shares of AIM common stock in the preceding two years.[81]  Jorgl also disclosed that his nominees, Chioini and Rice, did not own any shares of AIM common stock.

The following day, Tudor had a call with Kellner about the nominations.[82]  Kellner's handwritten notes of the call state: "Franz [Tudor] submitted 2 new

_____

[77] DX 77; *see also* Chioini Dep. 210-12.

[78] DX 75; DX 77; Chioini Dep. 111-12, 207-11.  Insofar as the messages are introduced to demonstrate that communications occurred (or the frequency by which they were made), such use is also permissible.  *See supra* note 28.

[79] DX 84 Ex. C ("Notice").

[80] Jorgl Dep. 145-46.

[81] Notice at 4.

[82] DX 78. The plaintiff objects to the introduction of Kellner's notes on hearsay grounds. But the notes are admissible under Delaware Rule of Evidence 803(1).  They are also admissible under Rule 801(d)(1)(A) insofar as the notes are inconsistent with Kellner's deposition testimony.  *See* Kellner Dep. 10 ("That was incorrect.  I learned later, when I got information from the attorneys, it was not [Tudor], but it was a gentleman named Jorgl.").

16

directors on Friday July 8th: 1. Mike Rice 2. Rob Chioini."[83]  Jorgl's nomination was not yet public.

On July 11, Xirinachs wrote to Chioini about the "AIM process," which he described as being in "full swing."[84]  He wrote: "The way I hope this all plays out is we get control of AIM . . . we continue to look for opportunities to either acquire, (to spin off at a later time), license technology, or possibly merger with."[85]  He twice referred to Jorgl's slate as "our slate."[86]

### F.    Formal Agreements Are Reached.

Despite Chioini and others having communicated with Baker Hostetler about the nominations since April 28, no engagement letter was executed before Jorgl's Notice was submitted.[87]  On July 11—the first business day after the Notice was submitted—Xirinachs emailed Baker Hostetler with the subject "Engagement

---

[83] DX 78.

[84] DX 79. The plaintiff objects to the introduction of this communication on hearsay grounds.  Insofar as the document is relied upon to show that the communication was made to Chioini, it is not hearsay.  *See supra* note 28.  To the extent that it is relied upon for the truth of the matter (if at all), it would be admissible under Delaware Rule of Evidence 804(b)(3) as a statement against interest.  Xirinachs was unavailable to testify, and the defendants were unable to procure his attendance by reasonable means.

[85] DX 79.

[86] *Id.*

[87] *See* Chioini Dep. 50-53 ("[A]n engagement letter actually was . . . executed after the Jorgl notice went in on July 8th.").

17

Letter."[88]  A slew of communications among Baker Hostetler, Chioini, and Xirinachs

followed.[89]  On July 15, an email with the subject "Completed: Please DocuSign:

Engagement Letter (Baker Hostetler)" was sent to Chioini.[90]  The date of Xirinachs'

execution is unknown because he did not respond to the subpoenas served on him in

connection with this litigation.[91]

Efforts to confirm funding arrangements were also made.  On July 11,

---

[88] DX 93 at 7.

[89] *Id.* at 7-8.

[90] *Id.* at 8.

[91] The defendants have also moved for adverse inferences arising from what they allege to be Jorgl's "intentional refusal to disclose highly relevant information" and concealment of "the involvement of Michael Xirinachs." *See* Mot. to Compel and for Adverse Inferences 1 (Dkt. 110).  The defendants' motion was prompted by Jorgl's failure to disclose Xirinachs in his interrogatory responses concerning: the identities of persons with knowledge of the facts alleged in the Complaint; the identity of individuals or entities providing financing or funding for the litigation; and communications with any person about his nomination effort. *See id.* at 3; *id.* Ex. 2.  The defendants argue that Jorgl's incomplete responses left them unable to learn the extent of Xirinachs' involvement until documents including Xirinachs were produced late in discovery.  This gave the defendants limited time to serve subpoenas on Xirinachs, which he ultimately did not respond to.

The fact that the defendants learned about Xirinachs late in the game is not ideal. Nonetheless, I decline to impose an adverse inference.  That sanction "is appropriate where a litigant intentionally suppresses or destroys pertinent evidence." *Sears, Roebuck and Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006); *see also Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *7 (Del. Ch. May 18, 2009) (issuing an adverse inference when, knowing that litigation was imminent, the defendant intentionally or recklessly deleted thousands of electronic files that were largely irretrievable); *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *30 (Del. Ch. July 22, 2015) (granting an adverse inference where the plaintiff recklessly failed to preserve potentially responsive information on his cell phone).  Even if Jorgl was not forthcoming, his conduct does not rise to the level that would justify an adverse inference.  He has not destroyed evidence and I lack grounds to conclude that he intentionally or recklessly concealed it.  The defendants' motion is therefore denied.

Xirinachs contacted Paul Tusa of River Rock Advisors LLC about a "potential consulting agreement that involved AIM."[92] On July 12, Xirinachs introduced Tusa to Chioini, telling Chioini that Tusa was "aware of our plans regarding AIM and will add valuable assistance in this process."[93]

Xirinachs also told Tusa there would be "an investment opportunity" requiring Tusa to pay certain expenses, though they "never really discussed . . . what the expenses would be."[94] Tusa was interested in investing, but River Rock was struggling. River Rock's bank account was about to close due to inactivity before Xirinachs gave Tusa $5,000 to keep the account open.[95] Tusa later changed his mind and never made a contribution concerning AIM.[96]

The proxy statement subsequently filed by Jorgl, Chioini, and Rice stated that Xirinachs "paid certain expenses on behalf of River Rock [] and agreed to be jointly responsible for expenses with Mr. Chioini going forward."[97]

---

[92] PX 88 ("Tusa Dep.") 48; *see also* Rice Dep. 153-55 (testifying that Tusa was involved in the nomination because he was contributing part of the fees).

[93] DX 80.

[94] Tusa Dep. 49-50.

[95] *See id.* at 30-33.

[96] *Id.* at 71-72, 103.

[97] DX 91 at 19.

## G.     The Board Rejects Jorgl's Proposal.

The Board was suspicious upon receiving Jorgl's notice.  It seemed strange that Jorgl had recently purchased a small number of shares and that neither of his nominees were stockholders.  It was also striking that he had nominated Chioini, who Lautz sought to nominate a few months earlier.[98]

Equels and Rodino decided to investigate.  Their research of publicly available information revealed ties among Tudor, Chioini, and Rice.  In particular, they learned that Tudor and Chioini had worked together at Rockwell Medical before Chioini was terminated, that Rice had served as an advisor to Rockwell Medical, and that Chioini and Tudor had also worked together at SQI Diagnostics.[99]

On July 14, the AIM Board met to consider whether the Notice complied with the advance notice provisions in AIM's bylaws.[100]  The Board discussed, among other things, the Jorgl Notice, the prior Lautz proposal, and Tudor's interactions with AIM.  The directors considered Jorgl's recent stock purchase and Chioini's role in both the Lautz and Jorgl nominations.  They also assessed "various information and

---

[98] *See, e.g.*, Appelrouth Dep. 93; Mitchell Dep. 54; Equels Dep. 209 ("[T]he idea that Jonathan Jorgl woke up 10 days before this nomination, ran out to buy a thousand shares of AIM, which is exactly the same number as Walter Lautz in his proxy proposal, and then . . . nominated Mr. Chioini, who is the same person that was nominated by Walter Lautz, struck me as not only implausible but impossible.").

[99] *See* Rodino Dep. 216-17.

[100] *See* DX 81 at 2.

evidence" suggesting that a nameless group was working together "with the intent o[f] taking control of the company and potentially raiding it or taking other action adverse to the stockholders."[101]

The Board determined there was a strong likelihood that the Notice was prompted by undisclosed arrangements or understandings.[102] The individuals identified as potential participants were Tudor, Deutsch, Kellner, Jorgl, Lautz, Chioini, and Rice based on "both information publicly available and e-mails that the Company received from a number of th[o]se players."[103] The Board voted unanimously to reject the Notice.[104]

The Board also authorized AIM to file a complaint in the United States District Court for the Middle District of Florida against Jorgl, Chioini, Rice, Tudor, Deutsch, Kellner, and Lautz for failing to file a Schedule 13D notice reflecting that they were a group for purposes of federal securities laws.[105] That complaint was filed on July 15, 2022.[106]

---

[101] Equels Dep. 229; *see* DX 81; Mitchell Dep. 54-55; *see also* DX 92 at 20-21.

[102] Mitchell Dep. 55; Appelrouth Dep. 98-100; Equels Dep. 229-232.

[103] DX 81 at 3.

[104] *Id.* at 1-2.

[105] DX 85 ¶ 25.

[106] *See* PX 43; *see also* DX 87.

On July 19, Jorgl was notified that his Notice had been rejected.[107]

## H.    This Litigation

Jorgl filed his Verified Complaint in this court on July 29.[108]  The Complaint advances a single count seeking a declaration that the defendants have not complied with AIM's advance notice bylaw.

On August 1, Jorgl filed a Motion for Preliminary Injunction.[109]

On August 19, the court granted an order governing expedited discovery and briefing in advance of a preliminary injunction hearing.[110]

After briefing on the preliminary injunction motion was completed, oral argument was held on October 5.[111]

## II.    LEGAL ANALYSIS

"The extraordinary remedy of a preliminary injunction is granted sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[112]  To obtain a preliminary injunction,

---

[107] DX 84 Ex. D.

[108] Dkt. 1.

[109] Dkt. 5.

[110] Dkt. 30.

[111] *See* Dkts. 164, 201.

[112] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998) (citation omitted).

Jorgl must demonstrate: "(1) a reasonable probability of ultimate success on the merits at trial; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable injury before the final hearing; and (3) that the balance of hardships weighs in the movant's favor."[113]

There is no fixed approach to how the court should weigh these elements relative to one another. "A strong showing on one element may overcome a weak showing on another element."[114] But a failure to prove any of the three elements defeats the application.[115]

The first element of the injunction test requires Jorgl to establish a reasonable probability of success on the merits of his claim. That showing "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made."[116] Jorgl's sole claim seeks a declaration that the defendants have not complied with AIM's bylaws regarding director nominations.

---

[113] *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007).

[114] *Cantor Fitzgerald*, 724 A.2d at 579.

[115] *Id.*

[116] *Id.*

23

But, as Jorgl recognizes, a higher merits standard applies.[117] He asks that the court enjoin the defendants from "refusing to acknowledge the July 8, 2022 notice" and from "preventing" Chioini and Rice from being "voted on at the annual meeting and included in AIM's proxy materials."[118] In effect, he is asking the court to order the defendants to acknowledge his nominees as valid, permit his nominees to stand for election, and include his nominees on a universal proxy card.[119] That amounts to a request for mandatory injunctive relief.[120]

"[I]t is a well settled principle of equity that a preliminary mandatory injunction will not issue unless the legal right to be protected is clearly established."[121] To obtain mandatory relief, Jorgl must make the more onerous

---

[117] Pl.'s Suppl. Opening Br. 33 ("Although Jorgl submits this brief in support of his Motion for a Preliminary Injunction, he recognizes that when a plaintiff seeks the same relief through a preliminary injunction that he hopes to receive through a final decision on the merits, then a higher mandatory injunction standard is proper."); Pl.'s Reply Br. 17.

[118] *See* Dkt. 5 ¶ 1; Dkt. 4.

[119] Pl.'s Suppl. Opening Br. 34. Jorgl initially also asked that the court enjoin the defendants from disparaging him or his nominees during the proxy contest. His preliminary injunction brief no longer seeks that relief and his request for a preliminary injunction on that basis is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[120] *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *12 (Del. Ch. Oct. 13, 2021) (declaring that an order forcing a board to include on the ballot the nominees from the rejected nomination notice amounted to mandatory injunctive relief); *AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) (explaining that where the plaintiff requested injunctive relief allowing it to run a dissident slate, it effectively sought a mandatory injunction requiring the board to waive the company's advance notice bylaw).

[121] *Steiner v. Simmons*, 111 A.2d 574, 575 (Del. 1955).

24

"showing that [he] is entitled as a matter of law to the relief [he] seeks based on undisputed facts."[122] That is, he must "make a showing sufficient to support a grant of summary judgment."[123]

My analysis of the merits of Jorgl's claim proceeds in two steps. I begin by considering whether he has demonstrated that the Board breached the bylaws when it rejected the Notice. Because my inquiry does not end there, I then consider whether the defendants' rejection of the Notice was unreasonable or inequitable.

I conclude that Jorgl has not satisfied the applicable standard. It is doubtful that he could show a reasonable probability of success on the merits—much less that he is entitled to a judgment as a matter of law. Moreover, given the number of important factual disputes that were raised during this proceeding, it would be inappropriate for this court to award a mandatory injunction.

---

[122] *Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008); *see also BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 976-77 (Del. 2020) ("There is a 'higher mandatory injunction standard where, instead of seeking to preserve the status quo as interim relief, [plaintiffs], as a practical matter, seek the very relief they would hope to receive in a final decision on the merits." (quoting *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004))).

[123] *Saba Cap.*, 224 A.3d at 977; *see also C & J Energy Servs., Inc. v. City of Miami Gen. Empls.*, 107 A.3d 1049, 1053-54 (Del. Ch. 2014) ("To issue a mandatory injunction requiring a party to take affirmative action . . . the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts.").

## A. Whether the Notice Complied with the Bylaws

"The bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers and stockholders formed within the statutory framework of the Delaware General Corporation Law."[124]  The court is bound by principles of contract interpretation when assessing them.[125]  The terms of the bylaws will be "given their commonly accepted meaning."[126]  If a bylaw is unambiguous, the court "need not interpret it or search for the parties' intent."[127]  Any ambiguity in an advance notice bylaw is resolved "in favor of the stockholder's electoral rights."[128]

Section 1.4 of AIM's bylaws describes the requirements for providing advance notice of the nomination of individuals to stand for election as directors.[129] The nominating stockholder must be a stockholder of record at the time the notice is delivered.  The notice must be filed "not less than ninety (90) nor more than one

---

[124] *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015).

[125] *Brown v. Matterport*, 2022 WL 89568, at *3 (Del. Ch. Jan. 10, 2022) ("When construing a corporation's bylaws, the court is bound by the principles of contract interpretation."), *aff'd*, 2022 WL 2960331 (Del. July 27, 2022) (ORDER).

[126] *Hill Int'l*, 119 A.3d at 38 (quoting *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010)).

[127] *Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001).

[128] *Saba Cap.*, 224 A.3d at 977 (quoting *Hill Int'l*, 119 A.3d at 38).

[129] DX 84 Ex. B ("Bylaws") Art. I § 1.4.

hundred twenty (120) days prior to the anniversary date of the immediately preceding annual meeting of the stockholders."[130]

The bylaws also set out categories of information that must be disclosed by the nominating stockholder. Relevant here, Section 1.4(c) provides:

> For any Stockholder Proposal that seeks to nominate persons to stand for election as directors of the Corporation, the stockholder's notice also shall include (i) a description of all arrangements or understandings between such stockholder and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made.[131]

That provision further requires the disclosure of information relating to the nominating stockholder or the nominees "that would be required to be disclosed in a proxy statement . . . pursuant to Section 14 of the Securities Exchange Act[.]"[132]

For Jorgl to prevail on his claim that the Board violated Section 1.4(c) when it refused to accept his nominations (without regard to whether the Board acted inequitably), he must first demonstrate that his Notice satisfied that provision. "Clear and unambiguous advance notice bylaw conditions act, in some respects as conditions precedent to companies being contractually obligated to take certain actions."[133] Jorgl has failed to show that his Notice undisputedly the bylaw's terms.

---

[130] *Id.* § 1.4(a)(2).

[131] *Id.* § 1.4(c).

[132] *Id.*

[133] *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *13 n.142 (Del. Ch. Feb. 14, 2022); *see also Saba Cap.*, 224 A.3d at 979-81 (holding that a

27

### 1. The Arrangement or Understanding Disclosure Requirement

The Company's letter rejecting Jorgl's Notice stated that he failed to provide the information required by Article I, Section 1.4, subsection (i).[134] That subsection requires the disclosure of "a description of all arrangements or understandings" between the nominating stockholder "and each proposed nominee and any other person or persons . . . pursuant to which the nomination(s) are being made."[135]

The terms "arrangement" and "understanding" are not defined in AIM's bylaws. In such circumstances, Delaware courts "look to dictionaries for assistance in determining the plain meaning" of contractual terms.[136]

An "arrangement" is defined by Black's Law Dictionary as "a measure taken or plan made in advance of some occurrence sometimes for a legal purpose; an agreement or settlement of details made in anticipation."[137] An "understanding" is defined as an "an agreement, especially of an implied or tacit nature."[138] Other

---

stockholder was not excused from its failure to comply with the letter of an advance notice bylaw, thus giving the board grounds to reject its nomination).

[134] DX 84 Ex. D.

[135] Bylaws § 1.4(c).

[136] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[137] *Arrangement*, Black's Law Dictionary (11th ed. 2019).

[138] *Understanding*, Black's Law Dictionary (11th ed. 2019). An "agreement" is a "mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons"; and the "parties' actual bargain as found in their language or by implication from other circumstances, including course of dealing, usage of trade, and course of performance." *Agreement*, Black's Law Dictionary (11th ed. 2019) (first and second definitions).

definitions of those terms are similar.[139]  The definitions of "arrangement" and "understanding" are consistent with the interpretation of the phrase "agreement, arrangement or understanding" in other corporate and securities law contexts.[140]

Giving the terms "arrangement" and "understanding" their commonly accepted meanings, Section 1.4(c) required Jorgl to disclose any advance plan, measure taken, or agreement—whether explicit, implicit, or tacit—with any person towards the shared goal of the nomination.  At one extreme, a quid pro quo was not (as Jorgl argues) required.[141]  Although an "arrangement" can be shown by an

---

[139] *See Arrangement*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/arrangement (last visited Oct. 26, 2022) ("something arranged: such as [] a preliminary measure . . . [or] an informal agreement or settlement especially on personal, social, or political matters"); *Arrangement*, Oxford English Dictionary (2d. ed. 1989) ("Disposition of measures for the accomplishment of a purpose; preparations for successful performance."); *Understanding*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/understanding (last visited Oct. 26, 2022) ("[A] mutual agreement not formally entered into but in some degree binding on each side."); *Understanding*, Oxford English Dictionary (2d. ed. 1989) ("A mutual arrangement or agreement of an informal but more or less explicit nature.").

[140] *See, e.g.*, *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *24-25 (Del. Ch. May 31, 2022) (discussing the definition of "acting in concert" as tracking "the general corporate law understanding that persons act in concert when they have an agreement, arrangement, or understanding regarding the voting or disposition of shares"); 17 C.F.R. § 240.13d-5 (discussing when individuals form a group for purposes of federal securities laws); 8 *Del. C.* § 203(c)(9)(iii); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 353 (Del. Ch. 2000) (discussing, in the context of Section 203, that the terms "agreement," "arrangement," or "understanding" "permit a fairly high degree of informality in the form in which the parties come together" but "presuppose[] a meeting of the minds"); *see also* Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13873-72 (proposed Mar. 10, 2022) (proposing amendments to Rule 13D that would broaden the SEC's view of when persons should be treated as a "group").

[141] The plaintiff relies on then-Vice Chancellor Strine's decision in *Yucaipa American Alliance Fund* in arguing that an "arrangement" may indicate a "back and forth" that results

"agreement," for example, it can also take the form of a "measure" or "plan" before an event.[142] At the other extreme, the occurrence of discussions, a prior business or personal relationship, or an exchange of information is not alone sufficient to show an "arrangement or understanding."[143]

That description is "not odd or technical, but common sense."[144] Nor is the phrase "arrangement or understanding" ambiguous, making the canon of construction resolving ambiguities in favor of stockholders' rights inapt.[145]

---

in some type of "quid pro quos." *See* Pl.'s Suppl. Opening Br. 42 (quoting *Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310 (Del. Ch. Aug. 12, 2010)). His reliance on *Yucaipa* is misplaced. The passage relied upon is discussing whether a rights plan left the board free to enter into "understandings" and notes that it is "possible to think that the [] board might engage in back and forth with holders during the proxy solicitation process that would raise the potential for improper quid pro quos." *Yucaipa Am. All. Fund*, 1 A.3d at 357 n.245; *see also Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 66, 71 (Del. Ch. 2008) (discussing an "arrangement" in the context of illegal vote-buying). It does not indicate that the court must find a quid pro quo to conclude that an arrangement or understanding was reached.

[142] *See supra* note 137 and accompanying text.

[143] *See Totta*, 2022 WL 1751741, at *25 (discussing, in the context of an "acting in concert" provision, that a showing that "the stockholder plans to vote the same way as another stockholder, is acquainted with another stockholder, or even has a business relationship with another stockholder" is insufficient to demonstrate a group).

[144] *CytoDyn*, 2021 WL 4775140, at *18.

[145] *See Saba Cap.*, 224 A.3d at 977 ("If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholder's electoral rights." (quoting *Hill Int'l*, 119 A.3d at 38)).

### 2.    Jorgl's Notice

The clear language of the bylaws obligated Jorgl to disclose any arrangements or understandings pursuant to which his nomination was made. Jorgl's Notice stated, in relevant part:

> Although the Nominating Stockholder and the Nominees do not have a formal agreement as of the date of this Notice, it is expected that the Nominees will pay or contribute to the costs of the solicitation of proxies for their election, including the costs and expenses of the Nominating Stockholder. Except for the foregoing, as of the date of this Notice, the Nominating Stockholder is not party to any agreements, arrangements or understandings with any other stockholders of the Company nor with the Nominees or any other person pursuant to which the nominations are being made.[146]

Jorgl maintains that this narrative satisfied the requirements of Section 1.4(c). The defendants disagree, arguing that it failed to disclose arrangements or understandings with Xirinachs and Tudor.[147]

Based on the limited factual record before me, it appears that Tudor and Xirinachs were working with Chioini and others to devise legal strategies and formulate a plan for the proxy contest. They engaged in advance planning towards

---

[146] Notice at 3.

[147] The defendants point to other so-called conspirators that they say were parties to arrangements or understandings, such as Deutsch. I decline to address every potentially involved person given that the roles of Tudor and Xirinachs are most apparent (despite the dearth of discovery about Xirinachs).

31

a common end: to find an AIM stockholder who would transfer shares into record name and serve as the "face" of their nomination. That stockholder was Jorgl.

The evidence also indicates that Tudor's and Xirinachs's actions went beyond loose discussions about the nominations. Their actions appear purposefully directed toward a shared goal of taking control of the Board. They were coordinated and constructed over a period of weeks.

Tudor launched the effort in the spring, leading to Lautz's nomination of Chioini and Ring. When that failed, Tudor tried again. Chioini put Tudor in touch with Rice as a possible nominee, and Rice asked Jorgl to become a stockholder and serve as the nominator. Tudor went dark around the time Jorgl entered the picture in late June,[148] though Kellner's contemporaneous notes the day after the Notice was submitted make clear that Tudor maintained some involvement.[149]

Xirinachs's direct contact with Jorgl before July 8 was focused on helping Jorgl transfer his shares into record name—a measure necessary for the nomination to succeed. Behind the scenes, Xirinachs was working with counsel and Chioini to put the "AIM process in[to] full swing."[150] He joined discussions with counsel about

---

[148] *Cf.* Tudor Dep. 60, 119 (testifying that he "had no idea" the Jorgl nomination "was happening" until he "got sued or [] saw the press releases").

[149] DX 78.

[150] DX 79.

the "nomination, proxy contest, and strategy" before the Notice was submitted.[151]

Between June 2 and July 8, Xirinachs appears on Chioini's privilege log 37 times.[152]

The extent and subject of these communications seem to belie Jorgl's position that

Xirinachs remained on the periphery through July 8.

Irrespective of this evidence, Jorgl insists that the information he provided in

the Notice was truthful and to the best of his knowledge at the time. He contends

that there was no arrangement or understanding with Tudor to disclose because he

does not know Tudor and never communicated with him.[153] As to Xirinachs, Jorgl

asserts that they only reached an arrangement or understanding *after* the Notice was

submitted. Setting aside that Jorgl's argument would require me to overlook

questions of fact without the benefit of live testimony to resolve them, I cannot

accept it for several reasons.

---

[151] DX 93; *see also* DX 50; DX 52; DX 65.

[152] *See* DX 93. These communications were also withheld on the basis of a common interest privilege. *Id.* The assertion of the common interest privilege implies that the parties to the communication were working together towards a shared objective. *See Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *2 (Del. Ch. Mar. 20, 1986) ("Rule 502(b) is a recognition that a disclosure may be regarded as confidential even when made between lawyers representing different clients if in circumstances, those clients have interests that are so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers."); *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 2011 WL 532011, at *4 (Del. Super. Feb. 2, 2011) (describing common interest privilege as applying to "parties engaged in a common enterprise").

[153] *See* Jorgl Dep. 71; Tudor Dep. 44, 113-14.

First, if Jorgl was uninformed about the extent of Tudor's and Xirinachs's involvement, that would not necessarily mean that his Notice was complete. The statement that Jorgl was not a "party to any agreements, arrangements or understandings" essentially told AIM and its stockholders that Jorgl was working alone (except for some informal agreement that Chioini and Rice would pay Jorgl's costs and expenses).[154] The evidence suggesting that Jorgl was part of an overarching arrangement or understanding that formed before July 8 puts the veracity of that statement in doubt.

Second, the communications that Jorgl was a party to suggest that his disclosure about "arrangements or understandings" was at least misleading. The Notice did not disclose an arrangement pursuant to which Jorgl was asked to purchase AIM shares and put them into record name. It did not disclose the understanding that Jorgl would not have to pay any expenses if he submitted the notice.[155] And it disclosed that Rice might provide some funding, which is contradicted by the record.[156]

---

[154] Notice at 3.

[155] To the extent that a quid pro quo is required to demonstrate an arrangement or understanding, as the plaintiff contends, this could be it.

[156] Rice Dep. 121, 156-57.

Third, even if Jorgl did not know the extent of Tudor's and Xirinachs' roles in the nomination, Chioini knew. Chioini had direct involvement in the preparation of the Notice. But he, too, stayed silent.[157]

Jorgl has therefore failed to show that the Notice complied with the bylaws. Section 1.4(c) unambiguously required him to disclose any "arrangements or understandings" pursuant to which his nomination was submitted. I cannot conclude, on this record, that Jorgl's Notice provided all such information. Accordingly, Jorgl is not entitled to a judgment as a matter of law that the Board breached the bylaws by refusing to accept his nomination.

### B. Whether the Board's Rejection of the Notice Was Equitable

The fact that the Notice did not satisfy the unambiguous requirements of the bylaws is not the end of my inquiry. The Board's technical entitlement to reject the Notice does not necessarily mean that equity will allow it to stand. The court must go on to consider whether the directors' actions comport with the overarching principles of *Schnell* that "inequitable action does not become permissible simply because it is legally possible."[158] Here, too, Jorgl cannot demonstrate his entitlement to a judgment as a matter of law.

---

[157] *See* Pl.'s Suppl. Opening Br. 19-21.

[158] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971); *Lee Enters.*, 2022 WL 453607, at *15 ("Delaware law necessarily leaves room for assessing whether a board's actions in enforcing a clear advance notice bylaw were justified, consistent with the doctrine of *Schnell*.").

### 1. Standard of Review

The parties agree that some form of enhanced scrutiny must guide the court's review of the Board's enforcement of the bylaw. They disagree on the standard's label and requirements. Jorgl asserts that the defendants must show a "compelling justification" for their actions as set forth in *Blasius*.[159] The defendants, for their part, assert that enhanced scrutiny review—"[w]hether labeled as *Unocal* or *Blasius*"—that looks to the reasonableness of the Board's actions should apply.[160]

"*Blasius* does not apply in all cases where a board of directors has interfered with a shareholder vote."[161] If the court were required to make a "find[ing] that the board acted for the primary purpose of disenfranchisement to trigger a more stringent review, it will have already made a normative judgment about whether the board engaged in manipulative conduct requiring judicial intervention."[162] Delaware courts apply that exacting review "sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter."[163]

---

[159] *See* Pl.'s Suppl. Opening Br. 38; *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988).

[160] *See* Defs.' Answering Br. 52 (quoting *Lee Enters.*, 2022 WL 453607, at \*15).

[161] *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at \*9 (Del. Ch. Dec. 4, 2000); *see also CytoDyn*, 2021 WL 4775140, at \*1.

[162] *Lee Enters.*, 2022 WL 453607, at \*14.

[163] *In re MONY Grp. Inc. S'holder Litig.*, 853 A.2d 661, 674 (Del. Ch. 2004).

Still, this court must "reserve[] space for equity to address the inequitable application of even validly-enacted advance notice bylaws."[164] Its careful scrutiny of directorial actions that affect the stockholder franchise "cannot appropriately be confined to the sort of blunt efforts to disenfranchise stockholders confronted in *Blasius*."[165] In such circumstances, enhanced scrutiny supplies a framework to assess whether directors acted in compliance with their fiduciary duties in applying an advance notice bylaw.[166]

Enhanced scrutiny requires a "context-specific application of the directors' duties of loyalty, good faith, and care."[167] The Board must "'identify the proper corporate objectives served by their actions' and 'justify their actions as reasonable in relation to those objectives.'"[168] If the Board's actions function as a reasonable limitation on the rights of stockholders to nominate directors, those actions "will generally be validated."[169] The court must, however, keep a "gimlet eye out for

---

[164] *CytoDyn*, 2021 WL 4775140, at *15 (emphasis removed).

[165] *Lee Enters.*, 2022 WL 453607, at *15.

[166] *Id.* at *14-15; *see also CytoDyn*, 2021 WL 4775140, *18, *22 (discussing whether the board's actions were "reasonable").

[167] *Lee Enters.*, 2022 WL 453607, at *16.

[168] *Id.* (quoting *Mercier v. Inter-Tel (Del.) Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007)).

[169] *Id.*

inequitably motivated electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects."[170]

## 2. Application of Enhanced Scrutiny

Advance notice bylaws are "commonplace" tools for public companies to ensure "orderly meetings and election contests."[171] They serve two primary functions. "The first is to set a time period by which stockholders must give notice of their intention to nominate director candidates in advance of an annual meeting. The second is an informational requirement that serves an important disclosure function, allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes."[172]

The defendants maintain that the requirements of Section 1.4(c) are intended to serve the latter function. Jorgl does not question the Board's intentions in adopting its advance notice bylaw. The bylaw was adopted on a clear day in 2017— long before Tudor, Xirinachs, or Jorgl entered the picture.[173] The Board did not change its policies or its interpretation of the bylaws to make compliance

---

[170] *Chesapeake Corp.*, 771 A.2d at 323.

[171] *Lee Enters.*, 2022 WL 453607, at *9.

[172] *Id.*

[173] *See CytoDyn*, 2021 WL 4775140, at *14 (discussing bylaws adopted "years before th[e] putative proxy contest was conceived").

challenging.[174]  The requirements of Section 1.4(c) are not unusual or difficult to comply with.[175]

Rather, Jorgl questions the provision's potential breadth and inequity in application.  By his logic, if the phrase "arrangements or understandings" is not limited to circumstances where exchanges of promises are made, the standard becomes unworkable.

One can envision an advance notice bylaw with so broad a reach that it mandated the disclosure of mere discussions among stockholders.  But I need not decide whether such a bylaw would have a legitimate corporate purpose or if a board's enforcement of it in rejecting a stockholder nomination would be reasonable. As previously discussed, the plain language of the bylaw at issue is not so sweeping.[176]

---

[174] *See Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, *12 (Del. Ch. Jan. 14, 1991) (finding that a board had a duty to waive an advance notice bylaw because a "radical shift in position, or a material change in circumstances" occurred after the deadline for nominations passed).

[175] *See CytoDyn*, 2021 WL 4775140, at *19 (explaining that advance notice bylaw "provisions asking stockholders to disclose supporters are . . . ubiquitous"); *AB Value P'r*, 2014 WL 7150465, at *3 ("The clearest set of cases providing support for enjoining an advance notice bylaw involves a scenario where a board, aware of an imminent proxy contest, imposes or applies an advance notice bylaw so as to make compliance impossible or extremely difficult, thereby thwarting the challenger entirely.").

[176] *See supra* note 143 and accompanying text.

By its terms, Section 1.4(c) required the disclosure of information about "arrangements or understandings"—that is, agreements, measures, or plans taken towards a common end.[177] That mandate was not unreasonable. There are legitimate reasons why the Board would want to know whether a nomination was part of a broader scheme relating to the governance, management, or control of the Company. More critically, that information would have been important to stockholders in deciding which director candidates to support.[178]

The parties clash over whether the Board's rejection of the Notice was a reasonable response in relation to these corporate purposes. The defendants assert that the current record shows the Board surmised, based on the information available to it, that the Notice was part of a scheme involving undisclosed arrangements and understandings and acted accordingly. Jorgl disagrees, pointing to facts that he says show the Board acted to entrench itself at the expense of his right to nominate directors.

This factual dispute alone makes an award of a mandatory injunction unattainable. Yet, Jorgl argues that the court can find the Board was unquestionably

---

[177] *See supra* notes 140-43 and accompanying text.

[178] *See Hubbard*, 1991 WL 3151, at *6 ("As the nominating process circumscribes the range of the choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders."); *CytoDyn*, 2021 WL 4775140, at *21 (discussing a nomination notice that failed to provide information that would have been material to stockholders in voting on director nominees).

motivated by ill intent or acted manipulatively. Making that determination would ignore several issues that seem to undermine his position.

To start, the context in which the Board received and considered Jorgl's Notice cannot be ignored.[179] The Board knew that Tudor had previously been convicted of securities fraud, was the subject of an SEC injunction, and had interfered with AIM to the point that AIM sought injunctive relief in Florida.[180] The Board also understood that AIM management suspected Tudor was behind the defective Lautz nomination and that, after the Lautz nomination was rejected, Tudor had threatened to take the "gloves off."[181]

The Board had grounds to question Jorgl's motives when he emerged on the scene—having purchased shares just 10 days before submitting his Notice—to nominate two individuals (who owned no AIM stock) including Chioini, who Lautz had attempted to nominate.[182] Of course, stockholders can buy shares just before making a nomination and can nominate whomever they like. The confluence of information the directors had after receiving the Notice would, however, have piqued their suspicions. The July 14 Board minutes explain that the directors

---

[179] *See CytoDyn*, 2021 WL 4775140, at *16 (discussing the "context" in which a notice was "submitted and then considered by the incumbent Board").

[180] *See supra* notes 15-16, 20 and accompanying text; Equels Dep. 215-16.

[181] DX 50; Equels Dep. 216-17.

[182] *See* Equels Dep. 209.

41

rejected the Notice based on "information the Company and its advisors had learned to date regarding the group of individuals behind the nomination notice."[183]

Jorgl argues that the Board cannot justify its rejection of the Notice based on after-discovered information, such as the role of Xirinachs, that the defendants uncovered during this litigation. That is true. But genuine suspicions based on known facts that are later corroborated can be a basis for a board to act.[184] Here, the directors assert that they were concerned Tudor and other undisclosed participants were acting "with the intent o[f] taking control of the Company and potentially raiding it or taking other action adverse to stockholders."[185] The evidence obtained through discovery prevents me from rejecting that concern out of hand.

That is not to say that the plan conceived of by those behind Jorgl's nomination is bad for AIM or its stockholders or that Chioini and Rice would not be worthy director candidates. Ideally, the stockholders—not the Board or this court—should decide the path for AIM. But if the nomination played a role in a broader scheme led by undisclosed supporters, that information would have been necessary for stockholders to make an informed choice on the matter.

---

[183] DX 81 at 1.

[184] *See CytoDyn*, 2021 WL 4775140, at \*21 (explaining that the board's rejection of the notice was appropriate where it "legitimately suspected" that undisclosed motivations were behind a nomination and evidence discovered in litigation corroborated those suspicions).

[185] Equels Dep. 229; *see, e.g.*, DX 79.

If such arrangements or understandings were concealed, the sanctity of the stockholder franchise would not be furthered by this court invalidating the Board's actions. In that case, those working through Jorgl—not the Board—would be the ones engaging in manipulative conduct. Equity cannot bless the perverse incentives that would be created if nominating stockholders could avoid disclosure requirements through purposeful ignorance.

Ultimately, these are matters that I need not presently decide. The swirl of lingering factual questions prevents me from granting judgment as a matter of law in Jorgl's favor. He has simply not proven his entitlement to mandatory injunctive relief.

## III.    CONCLUSION

For the reasons stated above, the plaintiff's Motion for a Preliminary Injunction is denied.

43